**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **ALMA BLAZQUEZ,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **No. 05-CV-4389** |
| **v.** | ) | |
| | ) | **HONORABLE DAVID H. COAR** |
| **BOARD OF EDUCATION OF THE** | ) | |
| **CITY OF CHICAGO; BARRY FRAZIN,** | ) | |
| **personally and as former vice principal of** | ) | |
| **John Coonley School; EDWARD RUYACK,** | ) | |
| **personally and as former principal of John** | ) | |
| **Coonley School,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Before this Court are the motions for summary judgment of the Board of Education of the

City of Chicago ("Board") (Doc. No. 93), Barry Frazin ("Frazin") (Doc. No. 98), and Edward

Ruyack ("Ruyack") (Doc. No. 101) (collectively "Defendants") against Plaintiff Alma Blazquez

("Plaintiff") pursuant to Federal Rules of Civil Procedure 56. For the reasons stated below,

Defendants' motions are GRANTED in part and DENIED in part.

**FACTS[1]**

Plaintiff was hired by the Board in August of 1999 to work within the Chicago Public

Schools ("CPS") system as a special education teacher at John Coonley Elementary School

("Coonley"). Over the next four years, Blazquez worked as a full-time basis substitute teacher

---

[1]These facts are derived from the parties' statements of facts filed pursuant to L.R.
56.1(b). The facts included herein are considered undisputed unless otherwise noted.

("FTB").  During her last year at Coonley, from 2002 through 2003, Plaintiff worked in room 308, an "upper cycle cross-categorical" classroom that included students from the sixth, seventh, and eighth grades who exhibited some type of learning disability.[2]  Plaintiff received positive evaluations from Coonley administrators leading up to the 2002-2003 academic year.

Plaintiff did not believe that her students were being treated equally to other Coonley students.  The students were not included on a multitude of seventh- and eighth-grade field trips.[3] Plaintiff does not deny, however, that field trips were organized and implemented by a committee of eight-grade teachers, that it was incumbent on teachers to initiate their own trips, and that Ruyack had told Plaintiff that field trip buses could not be reserved for a group as small as room 308 alone.  While some special education teachers were given one or two teaching aides, Plaintiff received only occasional assistance from office clerks through 2001.  In January of 2002, an aide by the name of Juan Castro ("Castro") was assigned to Plaintiff's classroom and remained there until Plaintiff was displaced from Coonley.  In-school and out-of-school suspensions were meted out to students for classroom problems, and Plaintiff maintains that the administration was reluctant to provide this punitive measure for her students.  Finally, while she was on leave, a word wall that Plaintiff had constructed for her students was torn down.  Plaintiff complained to Frazin several times about students in her room misbehaving.  Students' parents would also complain regarding abuse their children were suffering in room 308 at the hands of

_____

[2]The parties disagree as to the extent to which this categorization meant that the students were either learning disabled or emotional behavior disordered.

[3]Defendants maintain that all teachers were responsible for signing their students up for such trips and, because of Plaintiff's small class size, it was incumbent upon her to join with other groups to achieve sufficient student size to justify bus expenses.  Resp. to Add'l Facts ¶ 143.

their classmates, and a perceived lack of administrative support.

Plaintiff attributes many of the failings at Coonley to the distractions created by a private magazine distribution business in which Defendant Frazin had a financial stake. Frazin first revealed the existence of this business to Plaintiff during the 1999-2000 school year. Several other Coonley employees assisted in the distribution of these magazines, specifically, music teacher Gabor and Blazquez's aide Castro. The use of school computers, the contributions of Coonley staff, and/or the use of school property for unloading trucks were sufficient for a later investigation to find that there "was some activity that was going on at the school," and that "[t]here was evidence of some sort of magazine business." Plaintiff alternatively attributes Coonley administration's failures to discrimination.

During the 2002-2003 school year, a disruptive and abusive eighth-grade student referred to as "D.R." was placed in Blazquez's classroom.[4] D.R. consistently harassed the other students, interrupted Plaintiff's lessons, and generally undermined the educational environment of room 308. Plaintiff gave administrators numerous notices of the disruptions and threats D.R. brought to the classroom, but the student was not removed and does not appear to have been significantly disciplined. Special Education Student Development Teacher Terry Mitter ("Mitter") was responsible for assigning special education students to the appropriate special education classroom at all relevant times. Mitter never received information which led him to believe that D.R. needed to be removed from Coonley , or that it was necessary or possible to change D.R.'s placement within the school.

---

[4]The parties disagree as to whether or not D.R. suffered from Emotional Behavior Disorder.

Some attempts were made to improve the situation with D.R. During the 2002-2003 academic year, Ruyack had D.R. attend extra gym classes, apparently to let him expend excess energy, incentivize good behavior, and keep him out of the classroom for longer periods of time. In addition, in the fall of 2002, Plaintiff was visited at Coonley by Dr. Carleen Lorys ("Lorys"), a special education specialist. Lorys was responsible for compliance for special education programs, instructional support to school staff, technical assistance for programs and processes related to students with disabilities ("SWDs"), responding to parent inquiries and requests for assistance, in-service training, and assisting schools in planning for the least restrictive environment for SWDs. Lorys made some recommendations to Blazquez regarding how the classroom should be run, and indicated to Ruyack that there were ways in which Blazquez could improve her teaching methods.[5]

In December of 2002, D.R. verbally assaulted Plaintiff by saying he "was going to get" her. This threat was made more tangible by the fact that D.R. often spoke of how his father owned a gun that he threatened to bring to school, and the fact that D.R. had an altercation with another Coonley staff member – Carlos Santiago – during the previous month. D.R. did not receive an out-of-school suspension as a result of this event. Plaintiff attempted to file for "assault leave," a break from work responsibilities typically granted to teachers and other school staff following a serious confrontation with a student. However, Ruyack refused to sign this form. Plaintiff then took medical leave, sent an unsigned version of the assault leave form to CPS, and had the Chicago Teachers' Union ("CTU") file a grievance form with CPS based on

---

[5] The parties disagree as to whether or not Lorys actually observed Blazquez teaching in the classroom, rather than simply discussing her methods, and also disagree as to who invited Lorys to visit with Blazquez.

-4-

Ruyack's refusal to sign or take action concering the assault.

Under the terms of the collective bargaining agreement ("CBA"), Plaintiff attempted to have her grievance resolved. Eventually, Plaintiff was granted her assault leave retroactively. Despite this resolution, Plaintiff had a difficult time attaining recompense for her lost wages and health care expenses. Plaintiff returned to work on March 24, 2003, the date agreed upon through mediation. Plaintiff had been required to provide a statement from her physician releasing her to return to work. This letter was eventually filed much later, in August of 2003. Whatever the cause, in the summer of 2003 Blazquez was still listed as having been on leave.

There were several factors alleged by Plaintiff that arguably created a sexually abusive atmosphere at Coonley: Ruyack "pulling Plaintiff up" to dance at a school event in 2001 or 2002; Frazin attempting to kiss Blazquez in 1999 when she gave him a Christmas present; Frazin sitting on other teachers' desks; Ruyack's touching the face of a student several times; Ruyack's touching a mother's blouse near her breast; and Frazin and Ruyack's failure to discipline several boys who verbally and physically abused a female student in 308. In addition, Blazquez claims to have witnessed or been subjected to the following remarks: Ruyack told her "men wear the pants...why don't you just get married?"; Ruyack recounted past sexual "triumphs"; Ruyack referred to female teachers as "bitches"; Ruyack discussed how easy it is to be intimate with women when they are intoxicated; Ruyack referenced the size of women's breasts or butt; and

Frazin told a female teacher her daughter was "so fucking beautiful."[6, 7] Plaintiff also mentions additional references to sexually discriminatory acts made by other teachers.

In April of 2003, Blazquez called a phone number at the Board of Education and spoke with Dr. Lourdes Avales. In that conversation, Plaintiff complained that she was experiencing sexual and gender harassment, that the students were misbehaving, and that the principal and vice principal were running a private magazine delivery business out of the school. Add'l Facts ¶ 3-4.[8] Plaintiff was redirected to the CPS's Inspector General's ("I.G.") office, which is responsible for investigating allegations of waste, fraud, and mismanagement by CPS employees. Once in contact with the I.G.'s office, Plaintiff reiterated her complaints either directly or by message to Mary Beth, Jim Sullivan, Linda Brown, and Richard Slingerland. The bulk of her complaint, however, was "basically that we had no support because we feel the

---

[6]Defendant Frazin denies that the word "fucking" was used, and further maintains the comment was made in the context of telling the teacher that she should be aware of how upper-grade boys were looking at the daughter. *See* Resp. to Add'l Facts ¶ 92.

[7]Defendants generally deny that these comments were made, or do not recall the referenced conversations. Plaintiff's "undisputed facts" also reference allegations that indirectly suggest inappropriate language, including the Ruyack comment "I hope you are not dating anyone too dark, if you know what I mean," and Ruyack's response concerning a student who was masturbating in class, "are you sure that is not your problem?" Add'l Facts ¶ 84(g-h). Plaintiff's additional facts also contain several alleged examples that can in no way be construed as hostile once unsupported speculation over others' motivations are removed, *see, e.g., id.* ¶ 90 ("At the seventh and eight grade dance, Mr. Ruyack pulled Ms. Blazquez out on to the dance floor in order to make his girlfriend...jealous. After the dance Mr. Ruyack said something to a male visitor who was looking at Blazquez. The male visitor then approached Blazquez and asked her out to dinner."), or are attempts to inject sexual innuendo in the record, *see, e.g., id.* ¶ ("Mr. Frazin would say, 'This is Ms. Blazquez, the teacher, and not bad to look at either.' Frazin testified that he does not recall saying this, but he did think it." In truth, the cited language states that Frazin "may have" thought that.).

[8]Plaintiff also drafted a letter to Arne Duncan at the Board, which included additional allegations that Frazin and Ruyack were manipulating school records. However, there is no evidence that any Board member ever received or considered this letter or its arguments.

magazine delivery business took up a lot of time." 4/18/06 Blazquez Dep. at 166-67. On or around May 12, 2003, Plaintiff met with Slingerland and Gilbert Jimenez ("Jimenez") of the I.G.'s office and told them about her suspicions of administrative fraud, the existence of the private magazine business, and the administration's failure to provide Blazquez with $350 of allotted special education money. At that meeting she provided them with what she claimed was documentation to support her accusations, and alleged that other staff could attest to the private magazine business. Slingerland and Jimenez stated to Plaintiff that they would conduct surveillance at the school to see if any of these claims could be substantiated. Plaintiff only told one other Coonley employee about the I.G. investigation.

Greg Forst ("Forst") is an investigator with the I.G.'s office, responsible for investigating allegations of waste, fraud, and mismanagement by CPS employees and vendors. Forst was assigned to investigate Plaintiff's complaints about the Coonley administration. As a matter of policy and practice, the I.G.'s office does not disclose the identity of the complainant to persons implicated by the investigation. It does not appear that there was any communication between the I.G.'s office and Coonley administration during the 2002-2003 academic year, and all on-site investigatory work took place during the 2003-2004 year. Forst's investigation file was turned over to the Law Department for CPS at some point in 2004.

Faced with the possibility of a full investigation into the magazine business, Frazin was given the option to retire and did so. Defendant Frazin's employment with CPS ended on June 30, 2004. A "DO NOT HIRE" notation was placed on his file. Defendant Ruyack's employment at Coonley ended on July 1, 2004.

On May 7, 2003, Blazquez received a letter from Ruyack stating in relevant part:

It has come to the attention of the school administration that on several occasions you have informed your class, parents, as well as other teachers, that you are planning on taking Mr. Ruyack, Mr. Frazin and various students to court. Please be advised that you are to immediately cease making such comments to your class. The administration feels that such comments are inappropriate and are inconsistent with your prescribed duties as a teacher.

Failure to adhere to the above admonition will constitute insubordination and appropriate disciplinary action will be taken.

Ruyack Letter to Blazquez, May 7, 2003. Plaintiff read this letter as she was walking out of school that day, and immediately returned. Frazin put up his hand and indicated that Ruyack was the boss. Blazquez then responded, "No, you both have a boss that is bigger than both of you."[9]

Plaintiff drafted and delivered a letter to Frazin and Ruyack on May 8, 2003, that contained the following: general complaints of unequal treatment stemming from perceived racial discrimination; an admission and explanation for threatening certain students with going to higher authorities if their behavior continues; a reference to her efforts to go to the state legislature to have laws passed on these issues; a denial that she had spoken to any parents about these concerns; a threat that she would report "inappropriate computer uses by the administration and other? [sic]"; and a declaration that any continued accusations concerning her operation of the classroom would amount to harassment for which she should be able to defend herself with legal representation.

Both Frazin and Ruyack were responsible for ensuring that all students had access to education and that special education students were treated fairly. School principals are generally

_____

[9]The parties disagree as to whether or not Ruyack also received a written note from Blazquez at this point, defending her actions.

-8-

empowered to make employment decisions regarding school staff. However, they can only effectuate hiring or firing decisions with the approval of the Board's Human Resources ("HR") Department. Assistant principals do not recommend individuals to HR for hiring and firing directly, though their opinions may play a role in a principal's decision making process. Plaintiff received generally positive reviews in her job performance evaluations for available school year reviews. In fact, Frazin had offered to recommend Plaintiff for formal appointment to a teaching position at the start of the 2002-2003 year. Plaintiff completed the 2002-2003 academic school year at Coonley, and her last day of teaching at the school was June 27, 2003. However, she still maintained some presence at the school through the school's graduation.

During the following summer, Frazin and Ruyack discussed whether or not Blazquez was to be invited back for the 2003-2004 school year. At Ruyack's urging, Frazin contacted CPS human resources staff to find out what options were available regarding Plaintiff's continued employment. On July 15, 2003, Loren Claire-McClennan emailed Frazin to inform him that Blazquez had never been formally reinstated following her assault leave in the spring of 2003, and her continued employment was subject to the discretion of the Coonley administration. Ruyack recommended that the Board not reinstate Blazquez at Coonley. Ruyack's stated reasons for this decision are that: she allowed an adult male to enter Coonley and address her class without administration permission[10]; she permitted her children to exit a bus directly onto the street; she violated the Student Records Act by mentioning her students negatively by name in other students' report cards; and mentioned in her class that she planned on suing her students

_____

[10]Plaintiff admits that during the 2002-2003 year she brought a male into the classroom to address the students about a series of science lessons, but maintains that this was done with Ruyack's knowledge and permission. 5/5/06 Blazquez Dep. at 182.

and Coonley administrators. Facts ¶ 97. As a result of this displacement, Plaintiff's medical coverage ceased in July of 2003. There is no requirement under the relevant collective bargaining agreement or the Board's rules that an FTB be provided advance notice, in the summer, of his or her displacement from a particular school. Facts. ¶ 137.

Plaintiff received no written notice that she had been displaced from Coonley during the summer before the 2003-2004 school year. On August 27, 2003, on her way to beginning the fall term, Blazquez discovered from co-workers that she had been displaced from Coonley. On August 28, Blazquez returned to the school, at which point Frazin handed her a copy of a July 15, 2003 email from McClennan to Blazquez that referenced her change in job status. Plaintiff attempted to swipe in at the school on August 29th, pursuant to CTU instructions, but was told by Ruyack that she was trespassing. When she approached Nancy Slavin ("Slavin") of CPS's human resources department, Slavin allegedly attributed Plaintiff's job loss to her "big mouth" and referred to Ruyack as "a nice guy."[11] Blazquez applied for and received an FTB position at Perez Elementary School ("Perez"). Though initially it was not a paid position, Plaintiff began her work at Perez on September 8, 2007.

Plaintiff first sought legal remedy at the state level, but on August 1, 2005, Defendants removed the case from the Circuit Court of Cook County to this Court. On December 16, 2005, all state claims were dismissed as more appropriately dealt with in the state courts. On November 14, 2006, this Court granted Defendants' motions to dismiss with respect to all Title IX claims and other claims as to particular parties. Plaintiff's Amended Complaint at this point

---

[11]Slavin does not recall this conversation but does not deny that it took place. Slavin Dep. at 73.

retains the following eight counts:

Count I:      General abrogation of duties, under Section 504 of the
              Rehabilitation Act, 29 U.S.C. §§ 701-96, against Board of
              Ed, and Frazin and Ruyack in their official capacities

Count II:     Retaliation, under Section 504 of the Rehabilitation Act, 29
              U.S.C. §§ 701-96, against Board of Ed, and Frazin and
              Ruyack in their official capacities

Count III:    Due process violation, under 42 U.S.C. § 1983, against all
              defendants

Count IV:     Equal Protection violation, under 42 U.S.C. § 1983, against
              Frazin and Ruyack in their individual capacities

Count V:      Conspiracy, under "Federal law," against all defendants

Count VI:     First Amendment violation, under 42 U.S.C. § 1983,
              against all defendants

Count VII:    Retaliation, under Federal Whistleblowers Protection Act,
              31 U.S.C. § 3730(h); Federal False Claims Act, 31 U.S.C. §
              3729, against all defendants

Count VIII:   Sexual harassment, under 42 U.S.C. § 1983, against
              Ruyack in his individual capacity

At least one Coonley student has filed suit against CPS employees regarding the events at

issue in this case.

## STANDARDS

A party seeking summary judgment has the burden of showing, through "pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any," that there are no genuine issues of material fact that would prevent judgment as a matter of

law.  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, courts "must construe all facts

in the light most favorable to the non-moving party and draw all reasonable and justifiable

inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

Even so, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, she must go beyond the pleadings and support her contentions with proper documentary evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In order to successfully oppose a motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, *see Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material dispute of fact exists that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A non-moving party who bears the burden of proof on a specific issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute. *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989). This evidence provided by the non-movant must be sufficient to enable a reasonable jury to find in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Mere allegations in the pleadings, unsupported by record evidence, cannot create an issue of fact defeating summary judgment. *Burrell v. City of Mattoon*, 378 F.3d 642 (7th Cir. 2004). The Seventh Circuit has made it clear that "self-serving affidavits, without any factual support in the record, are insufficient to defeat a motion for summary judgment." *Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) as stating that "[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). However, it is possible to rebut a motion for summary judgment with the allegations of a complaint, but only to the extent that they are based upon the plaintiff's personal experience. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (requiring that allegations are admissible at summary judgment under 56(e) so long as they are "based on personal knowledge and [set] forth specific facts showing that there is a genuine issue for trial"). The fact that those statements may be "self-serving" is not a valid grounds for deeming them inadmissible. *See id.*

## ANALYSIS

### *Exhaustion of Administrative Remedies for Rehabilitation Act Claims*

In their motions to dismiss, and again at summary judgment, Defendants have argued that all claims brought under the Rehabilitation Act should be dismissed for Plaintiff's failure to exhaust administrative remedies. Specifically, Defendants cite *McGuinness v. United States Postal Service,* 744 F.2d 1318 (7th Cir. 1984) for the proposition that Blazquez must first have pursued her claim with the Equal Employment Opportunity Commission ("EEOC") in order to bring them before this Court. *See* Defs.' Dismiss Mot. at 9-10; *see also* Board Summ. J. Mem. at 13.

Plaintiff's private right of action under the Rehabilitation Act is created and defined by 29 U.S.C. § 794a. However, while Defendants cite to this section, they fail to draw the distinction between employment discrimination actions under section 501 of the Rehabilitation Act, which are dictated by the procedural rights and obligations of Title VII, and section 504, under which actions are to be brought according to Title VI processes. *See id.* §§ 794(a)(1)-(2). Title VII requires exhaustion, while Title VI does not, therefore because Plaintiff has brought her claim under the federally-funded program requirements of section 504, she need not have exhausted her administrative remedies. *See Hewitt v. U.S. Office of Personnel Mgmt.*, 390 F.Supp.2d 685, 690 (N.D. Ill. 2005) ("Cases, like Hewitt's, based on § 504 (as opposed to § 501) of the Rehabilitation Act may proceed directly to court, free of any requirement to exhaust administrative review. Section 504 of the Rehabilitation Act utilizes the remedies, procedures and rights applicable to Title VI of the Civil Rights Act of 1964, and nothing in the language of Title VI or § 504 requires exhaustion.") (citations omitted); *Wagner v. Illinois Dept. of Pub. Aid*, 2004 WL 2515836, at *6 (N.D. Ill., Nov. 5, 2004) ("An individual suing an entity other than the federal government under § 504 of the Rehabilitation Act, however, is not required to exhaust administrative remedies.").

There is an argument that could be made that this particular action is closer to an issue of employment discrimination and therefore could properly fall under the jurisdiction of the EEOC, or that some other available administrative remedy should have been pursued. *See, e g., Timms on Behalf of Timms v. Metro. School Dist. of Wabash County*, 722 F.2d 1310, 1318, n. 5 (requiring exhaustion where disabled student brought suit under section 504, based upon extensive remedies available to students in primary and secondary education). However, while

-14-

Rehabilitation Act cases involving employment discrimination may fall under the jurisdiction of the EEOC, it is unclear that this case would qualify as such. Defendants have asserted only that Plaintiff failed to bring her claims before the EEOC and the CPS's Internal Audit Unit, without clarifying whether either of those bodies could have heard a claim such as this that is not based upon direct discrimination against an employee for his or her own disability. In any event, this is a close question that has not been sufficiently argued by the Defendants on whom the burden lies. *Salas v. Wisconsin Dept. of Corr.*, 2007 WL 2048945, at *5 (7th Cir., July 18, 2007). Based on the record before this Court, it cannot be said that Plaintiff's failure to pursue other avenues is fatal where the procedural requirements of section 504 do not explicitly demand exhaustion, *Hewitt*, 390 F.Supp.2d at 690; *Wagner*, 2004 WL 2515836, at *6, and it is as yet unclear whether other administrative remedies were available to her, *see Timms*, 722 F.2d at 1318, n. 5.

### *Rehabilitation Act Violation and Standing*

Coonley is obligated under § 796f(b)(1)(D) of the Rehabilitation Act to promote "equal access of individuals with significant disabilities to society and to all services, programs, activities, resources, and facilities, whether public or private and regardless of the source of funding." Plaintiff claims in Count I that Defendants failed to provide her learning disabled students with the "required accommodations, modifications, supports, supplementary aids and services," as is required of a federal funding recipient under Section 504 of the Rehabilitations Act, 29 U.S.C. § 794 ("section 504").[12] Am. Compl. ¶ 45. Defendants respond: (1) that Plaintiff

---

[12] Section 504 states, in part, that "No otherwise qualified individual with a disability in the United States...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program

lacks standing to bring a claim under the Rehabilitation Act; (2) that even if Blazquez has

standing, she has not provided evidence that her students were in fact treated poorly by the

administration; and (3) that, even if the students were mistreated, that there is no evidence it was

done because of their disabilities.

In order to succeed on a claim under section 504, a plaintiff must establish that: (1)

claimants are disabled as defined by the Act; (2) they otherwise qualified for the educational

benefits sought; (3) they have been excluded from those benefits solely because of their

disability; and (4) the benefits they seek are part of a program or activity receiving federal

financial assistance. *See Burks*, 464 F.3d at 758. However, Plaintiff suffers a more general

challenge with respect to her standing under the Rehabilitation Act.

In order to bring a claim before this court, a plaintiff must satisfy the three general

requirements of Article III standing: (1) an injury in fact or immediate threat of injury; (2) that is

fairly traceable to the conduct of the defendant and; (3) a favorable court decision will likely

redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). These

requirements ensure that a plaintiff before the court has a personal stake in the outcome that

justifies assertion of the court's jurisdiction over his or her claim. *Warth v. Seldin*, 422 U.S. 490,

498-99 (1975). Generally, a plaintiff cannot bring a suit on behalf of others who are capable of

bringing the suit themselves or who have more appropriate representatives to protect their

interests. *See, e.g., Daniels v. Southfort*, 6 F.3d 482, 484 (7th Cir. 1983) (holding that plaintiff

could not sue on behalf of his friends for alleged violations of their Fourth Amendment rights);

---

or activity receiving Federal financial assistance or under any program or activity conducted by
any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a).

*see also Hoyt v. St. Mary's Rehab. Ctr*, 711 F.2d 864, 865 (8th Cir. 1983) (holding that "next friend and visitor" did not have standing to sue under § 504 when disabled patient had closer family members to represent her interests and plaintiff was not a "proper proponent" of the patient's interests).

If a plaintiff seeks to bring a claim on behalf of others, there are two general exceptions for standing that will allow him or her to do so - third party or associational standing - but both still require that a plaintiff demonstrate a stake in the outcome of the case. *See Singleton v. Wulff*, 428 U.S. 106, 112-118 (1976); *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). For third party standing, the plaintiff before the court must have suffered an injury so that they have some stake as well, show a close relationship with the absent party, and prove that there was a hardship preventing the absent party from bringing the case on his own behalf. *See Singleton*, 428 U.S. at 112-118 (upholding ability of physician to bring claim on behalf of patients regarding government interference in abortions). Associational standing allows a plaintiff organization to bring suit on behalf of its members or represented parties if those individuals would have a right to sue on their own, if the organization's purpose is related to the interests being protected, and if the relief is not of the nature that it requires the individual members to participate in the lawsuit. *See Hunt*, 432 U.S. at 343.

As long as it does not exceed the scope of Article III standing, Congress may also authorize statutory standing to allow citizens to act as private attorneys general and seek legal remedies for violations on behalf of others. *Warth*, 422 U.S. at 501. In passing section 504 of the Rehabilitation Act, Congress arguably incorporated such an expansive view of standing for those who wished to assert the rights that it contained. The law contains broad language in its

enforcement provisions, authorizing "any person aggrieved" by discrimination against the disabled the right to sue. 29 U.S.C. § 794(a). The Sixth and Second Circuit Courts of Appeals have interpreted this to mean that persons or organizations associated with or providing services to the disabled may also have the right to sue. *See MX Group, Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002) (stating that Title II regulations also define discrimination so as to include "conduct directed at an entity based on its relationship or association with disabled persons"); *see also Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997). According to these interpretations, a person or organization injured by discrimination because of their association with the disabled could sue on their own behalf under section 504. *See MX Group*, 293 F.3d at 335.

However, the individual or organization must still show that they were an intended beneficiary of the statute, by demonstrating how the discrimination against them affected the rights of the disabled by its impact on their relationship or association. *See Simpson v. Reynolds*, 629 F.2d 1226, 1235 (7th Cir. 1980) ("To be actionable, the discrimination must come in the operation of the program or manifest itself in a handicapped individual's exclusion from the program or a diminution of the benefits he would otherwise receive from the program."). In defining the requisite injury to grant standing, the Seventh Circuit has interpreted "injury" to include the "deflection of [an] agency's time and money" away from its services to the disabled in order to address the effects of such discrimination. *See Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990); *see also Access Living of Metro. Chicago v. Chicago Transit Auth.*, 2001 U.S. Dist. LEXIS 6041, at *12 (N.D. Ill. May 9, 2001).

An important question when analyzing the appropriateness of third party or associational

standing is the nature of the relief sought. *See Warth*, 422 U.S. at 515 (holding that association must seek form of relief that will reasonably be supposed to benefit the members of the organization actually injured). If the relief sought primarily benefits the organization and not the clients or the parties it is representing, then there is no standing to seek redress. *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 280 (7th Cir, 2003) (holding that a for-profit organization operating drug addiction rehabilitation programs did not have standing to sue for discrimination under § 504 when zoning permit was denied to build new facility since relief sought was lost profits). A plaintiff must demonstrate standing separately for each form of relief sought and the remedies must be those which directly benefit the disabled. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167 (2000); *see also Discovery House*, 319 F.3d at 281. A plaintiff can recover money damages under the ADA or section 504 by showing a statutory violation resulted from "deliberate indifference" to the rights of the disabled secured by those statutes, but the money damages must go to benefit those individuals directly. *See Discovery House*, 319 F.3d at 281 ("[T]he remedies we may find...must, at the very least, be those which directly benefit the disabled. It would stretch the principle of *Bell v. Hood* too far to find that Discovery House has standing to recover lost profits under these statutes."); *see also K.M. v. Hyde Park Cent. Sch. Dist.*, 381 F.Supp.2d. 343, 358 (S.D.N.Y. 2005).

Several courts have refused to limit right of action under the Act to the disabled themselves. *See, e.g., Discovery House,* 319 F.3d 277 (surveying multiple court opinions allowing Rehabilitation Act or ADA actions brought by concerned organizations on behalf of the disabled; denying claim for lost profit as insufficiently related to the interests of the disabled, rather than more directly relevant injunctive or compensatory remedies); *Access Living,* 2001

WL 492473 ("This court agrees with the majority of courts which have considered this issue and finds that organizations serving the needs of disabled person have standing to bring claims under the ADA if they meet Article III's standing requirements, though they are not themselves individuals with disabilities."); *see also Reynolds Metals*, 629 F.2d at 1227 (in the case of a handicapped claimant not involved with the federal program in question, holding that "to maintain an action for employment discrimination under Section 504, a handicapped individual must be an intended beneficiary of the federal financial assistance received by his employer *or must be able to show that the discrimination directed against him affected the beneficiaries of such aid*") (emphasis added).

Plaintiff in the instant matter alleges that she suffered concrete injuries in her inability to work, detriments to her health, and subsequent loss of benefits at termination. This is sufficient to generally establish a case or controversy in satisfaction of Article III; however, whether these injuries can be remedied in an action under the Rehabilitation Act is a different question. Plaintiff maintains that she is not bringing her Rehabilitation Act claim on behalf of anyone else, but rather does so on her own behalf. *See* Resp. to Board Summ. J. Mot. at 10. Standing is allowable where a plaintiff's interests fall within the "zone of interests" protected by the law invoked. *Family & Children's Ctr., Inc. v. Sch. City of Mishawaka*, 13 F.3d 1052, 1058 (7th Cir.), cert. denied, 513 U.S. 961 (1994) (citing *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979)). This falls to a determination of whether or not the plaintiff is one of the "intended beneficiaries of the federal financial assistance in question." *Simpson v. Reynolds Metals Co., Inc.*, 629 F.2d 1226, 1234 (7th Cir. 1980). In this case, both the relevant rights and zone of interest of the Rehabilitation Act are defined by its purpose: "to empower individuals

-20-

with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society, through...the guarantee of equal opportunity." 29 U.S.C.A. § 701(b)(1); *see Oak RidgeCare Ctr., Inc. v. Racine County*, 896 F.Supp. 867, 871 (E.D. Wis. 1995) (finding that courts should look to statutory language and congressional intent to determine the zone of interests).

At first blush, Federal funds earmarked for disabled students are simply not intended to benefit their teachers. As broadly construed as Rehabilitation Act standing may be, it does not ensure the ongoing viability of persons or groups affiliated with the disabled, but rather was intended to benefit the disabled themselves – if the funding in this instance was intended for more expansive purposes, it was incumbent on Plaintiff to put such evidence forward. Indeed, Plaintiff too readily dismisses the fact that some courts have limited the proper beneficiaries of Rehabilitation Act-covered funding to those who are actually handicapped. *See Reynolds Metals*, 629 F.2d at 1232 (finding that being an "otherwise qualified handicapped person" is "a jurisdictional prerequisite to suit under s 504"). Plaintiff is not handicapped and therefore cannot assert these rights for herself.

She also does not match those narrowly-drawn exceptions to direct standing that have accommodated organizations benefitting the disabled. *See Discovery House*, 319 F.3d at 279 (acknowledging the possibility of suits being brought, via direct or third-party standing, where an organization seeks equitable relief or damages that would shift directly to the handicapped). There is room left under the Rehabilitation Act for those who would protect others' rights under the law, where acts taken against a plaintiff indirectly impact benefits owed to the disabled. *See Reynolds Metals*, 629 F.2d at 1227. In this instance, Plaintiff maintains that Defendants' failures

to properly support classroom 308 took her away from her ability to give the students the attention they deserved. Whether or not this qualifies as an indirect detriment to those who should benefit under the Rehabilitation Act is arguably a close question. However, as in *Discovery House*, an effective means of determining the appropriateness of Plaintiff's standing is whether the remedy sought matches the goals of the Act. *See Discovery House*, 319 F.3d at 280 ("That the nature of the relief sought is a relevant consideration in evaluating standing cannot seriously be contested."). Indeed, in *Discovery House* the court bypassed the question of whether the plaintiff was seeking direct or third-party standing and simply declined to assert jurisdiction based on the desired remedy of lost profits. *Id.* In this instance, Frazin and Ruyack no longer work at Coonley, as discussed below no discriminatory intent can be in any way tied to other CPS employees, and the only remaining remedy Plaintiff seeks would be damages for herself. No possible benefit can accrue to the disabled students of Coonley by allowing Plaintiff to bring this action on their behalf.

That Blazquez is not appropriately asserting standing under the Act is supported by the fact that Coonley students have brought suit against CPS and its employees based on the events in question here. *See* Add'l Facts ¶ 78; *Grandberry v. Bd. of Educ. et al.,* No. 06-C-2124 (N.D. Ill. filed April 18, 2006); *see also Singleton*, 428 U.S. at 115-118 (upholding third-party standing in part because protected parties could not effectively bring suit on their own behalf). The goals of the Rehabilitation Act are therefore being protected with respect to Coonley students, and by parties with more appropriate standing under the Act that can better effectuate its protections.

For the reasons stated above, this Court finds that Plaintiff lacks standing to bring this suit under the Rehabilitation Act. For that reason, Defendants' motions for summary judgment

are GRANTED with respect to her Rehabilitation Act claim (Count I).

### *Retaliation under Rehabilitation Act*

In Count II, Plaintiff also contends that she was retaliated against for reporting Coonley's failure to adequately support the learning disabled students. Am. Compl. ¶ 54. Section 504 of the Rehabilitation Act, at 29 U.S.C. §794(d), expressly incorporates the anti-retaliation provision of Section 503 of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203, prohibiting retaliation against "*any individual* because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *Id.* (emphasis added).

In order to succeed on a retaliation claim under Section 504, Plaintiff must establish that: (1) she engaged in a statutorily-protected activity; (2) she suffered an adverse action; and (3) there was a causal connection between the two events. *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006). As in other instances of retaliation, it is essential that she reasonably believed that the actions about which she was complaining were contrary to the law. *See Burks*, 464 F.3d at 758 n. 16 (adopting Title VII retaliation standards for retaliation actions under the Rehabilitation Act); *Firestine v. Parkview Health Sys., Inc.*, 388 F.3d 229, 234 (7th Cir. 2004) (discussing the requirement that Plaintiff bringing retaliation claim under Title VII reasonably believe that protections were triggered). Plaintiff also attempts to present her case via the indirect method of proof. *See* Resp. to Board Summ. J. Mot. at 14, 16-17 (citing *Burks*, 464 F.3d at 759 for the proposition that she can pursue her claim either directly or indirectly). Under the indirect approach to proving retaliation, Plaintiff must establish: "(1) that she engaged

in protected activity; (2) that she was subject to an adverse employment action; (3) that she was performing her job satisfactorily; and (4) that no similarly situated employee who did not engage in protected activity suffered an adverse employment action." *Burks*, 464 F.3d at 759 (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir.2002)). However, under either approach Plaintiff's claim fails.

Blazquez has not provided evidence that she suffered an adverse employment action, one of the necessary elements of her prima facie case under either the direct or indirect method. *Burks*, 464 F.3d at 759. "Although we define adverse employment action broadly, not everything that makes an employee unhappy is an actionable adverse action. For an employment action to be actionable, it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chicago*, 2007 WL 2128308 (7th Cir July 26, 2007) (citing *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000)). Those actions that can be deemed materially adverse include cases in which: "(1) the employee's current wealth such as compensation, fringe benefits, and financial terms of employment including termination; (2) the employee's career prospects thus impacting the employee's future wealth; and (3) changes to the employee's work conditions including subjecting her to humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in [her] work place environment." *Id.* (citing *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002)).

Plaintiff repeatedly claims that she was terminated from her position, but while outright termination would most likely satisfy this prong, *see Haywood v. Lucent Techs.*, 323 F.3d 524, 531-32 (7th Cir. 2003), she does not appear to have been terminated; Plaintiff was a full-time

basis substitute teacher without tenure or a right of return (see due process section below), who was not invited back for the 2003-2004 school year but who nonetheless remained a Board employee with the right to be considered for other teaching positions. *See* Facts ¶¶ 137-38; Clair-McClellan Supp. Decl. ¶¶ 14-15. While Plaintiff was undeniably displaced from Coonley, she almost immediately found another placement at Perez, amounting to a transfer from one school to another without any loss of pay. *See* Facts ¶ 9. Blazquez correctly points out that any material change in employment circumstances might qualify as an adverse employment action, but she nonetheless fails to provide evidence on which a factfinder could find that this was such an instance. *See Huppert v. Potter*, 2007 WL 1259062, at *4 ("The adverse action must be *materially* adverse such that the employee would be dissuaded from engaging in the protected activity.") (emphasis added) (citing *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir.2007)); *see also Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.1993) (finding that, in a Title VII case[13], an adverse employment action is one that *materially* affects the terms and conditions of employment); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1988) ("A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits") (emphasis added) (Title VII). Without more than the mere fact that she began working at a different school, Plaintiff has failed to provide facts on which a reasonable factfinder could find that the changes in her employment were either significant or material. *See*

---

[13]"The analysis of a retaliation claim under the Rehabilitation Act, 29 U.S.C. § 794, is identical to that under Title VII." *Huppert v. Potter*, 2007 WL 1259062, at *4 (7th Cir., April 30, 2007).

*Washington v. Illinois Dept. of Revenue*, 420 F.3d 658 (7th Cir. 2005) ("By and large a reassignment that does not affect pay or promotion opportunities lacks this potential to dissuade and thus is not actionable."); *compare Reed v. Manteno School Dist. No. 5*, 2002 WL 731780 (April 25, 2002 N.D. Ill.) (finding no adverse employment action where teacher moved from one teaching position to another) *with Mohr v. Chicago School Reform Bd. of Trustees*, 99 F.Supp.2d 934, 938 (N.D. Ill. 2000) (finding adversity in a reassignment "from the status of a regular teacher who was chairperson of her department to that of a substitute who must go sometimes to several schools a day and teach out of her area; or even to be deprived of the responsible position of department chairperson").

In addition, Plaintiff's direct approach to discrimination fails because she has not provided evidence on which a reasonable factfinder could find a causal connection between activity protected under the Rehabilitation Act and her displacement from Coonley.

First, the extent to which Plaintiff was acting in a manner protected under the act is vague in that her complaints were only loosely tied to the students' disabilities. In response to Defendants' motions for summary judgment, Plaintiff points to several complaints that she made to Frazin and Ruyack: general verbal requests for additional administrative assistance that she claims were ignored; a letter dated December 8, 2002 that outlined "various disruptions in her classroom and requesting assistance"; a letter dated April 30, 2003 "relating her concerns about the behavior of certain students, which had been disruptive to the safe, learning environment of her students and which had gone ignored by Frazin and Ruyack"; and a letter dated May 8 letter that mentions that "room 308 has not received fair treatment here at Coonley when it comes to our disciplinary issues," and that parent had been upset "over the lack of support my special

education classroom has received."[14]  However, though Plaintiff now characterizes these complaints as being protected under the Rehabilitation Act, their content in no way makes clear that she was complaining that they were being discriminated against for their disabilities, as opposed to attributing those failings to Frazin and Ruyack's personal feelings toward Blazquez, discrimination against her due to her gender, discrimination against the class due to the fact that most of them were minority students, or general administrative incompetence.

For example, in her December 8 letter, Plaintiff largely depicts the problem as involving interpersonal issues, stating: "It seems that every year that I have been the teacher in 308 I have been blamed or held extremely accountable for the stability for one of more students' (in 308) behavior...I am asking you both to take a step into my shoes and try to see what it is like trying to teach in an LD/BD/EBD daily with oppositional children who don't have clear and consistent consequences that all staff – that child also opposes – and administrative agree upon.  It just appears that some teachers are helped more than others at Coonley, that there is a bias."  The May 7, 2003 letter, mentions specific actions "may be against the law, including verbal assaults that were occurring in her classroom, and noted that she has received minimal help from Ruyack and Frazin," without making clear what she speculates is the cause of this mistreatment. Because Plaintiff only vaguely alludes to issues of discrimination based on disability, it is not clear that her complaints are based upon Rehabilitation Act protections.  There is simply no evidence that Plaintiff's vague suggestions that her class was being left out or unsupported by

_____

[14]In responding to Defendant's motions for summary judgment, Plaintiff also mentions handwritten notes that she dates May 7, 2003.  *See* Add'l Facts Ex. 8.  However, there is no evidence that this letter was ever seen by Defendants, so for present purposes it cannot be considered to have factored in their thinking regarding her employment status.

the administration – variously attributed to sexism against Ruyack, racism against the primarily minority students in the class, and bias against those with learning difficulties – was the reason behind the adverse employment action. Plaintiff places a great deal of her faith in the comment she made to them that you both have "a boss that is bigger than both of you." However, such a vague threat in no way would have alerted Frazin and Ruyack to the possibility of an action under the Rehabilitation Act.

If it is unclear whether Plaintiff's complaints are based upon discrimination against disabled students, she has completely failed to draw a causal connection between rights under the Rehabilitation Act and her eventual displacement from Coonley. This is most clear with respect to Plaintiff's only more formal complaint, that which she lodged with the I.G.'s office and which seemingly initiated an investigation into Coonley practices. The complaint had little to do with discrimination against disabled individuals sufficient to trigger Rehabilitation Act protections. *See generally* Blazquez 4/18/07 Dep. at 148 *et seq*. At the initial stages of her phone calls to the I.G., Plaintiff "asked for the person that I should talk to to complain about the sexual gender harassment at my school." *Id.* at 148. When summarizing her complaint, she stated: "I told [Dr. Lourdes] that I had taken leave. The reason I had taken a leave is because after several years of nonsupport at my school because the principal and vice principal had this magazine delivery business, my special education class was severely neglected." *Id.* at 149. When, during the same sequence of phone calls she was transferred to Gil and Slingerland, she gave them this same explanation of her complaint, mentioned her suspicions concerning alteration of student records, and elaborated further:

> [T]hat the school was basically being run by the students...And these men
> [Frazin and Ruyack] were pretty much absent from any responsibilities. I

> told them about the lack of my special ed. funds, and I also told them
> about my stress on the job and how I had to take the assault leave because
> I wasn't paid attention to by these two men; and of course, I told them
> about the magazine delivery business, and I actually left copies of the
> [magazines].

*Id.* at 157. Only in the loosest sense can this be considered to have been a complaint that her students were being discriminated against because of their disabilities.

Most importantly, however, awareness of the I.G. complaint could not have caused actions that preceded it – at the time they considered whether Blazquez should be rehired, there is no evidence that Frazin and Ruyack were aware of the I.G.'s pending investigation: the I.G.'s work was carried out according to a policy of discretion, Forts Aff. ¶ 3; there is no evidence of contact between the investigator and Coonley administrators throughout 2003, id. ¶ 4; and Plaintiff expressly stated that she told only one other person at the school about the investigation she had initiated, Facts ¶ 67. There is therefore no basis on which a reasonable factfinder could find that the I.G. investigation was a Rehabilitation Act-protected activity that might have caused Plaintiff's displacement from Coonley.

Plaintiff's attempt to prove her retaliation claim indirectly fails as well, for she has not provided evidence of an essential element, namely, that similarly-situated employees who were not engaged in protected activities were treated more favorably than she was. *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir.2002) (requiring that similarly-situated individuals must be "directly comparable to her in all material respects"). Plaintiff has pointed to 32 other employees within Coonley that she claims received better treatment. *See generally* Facts ¶¶ 45-48. However, she fails to show how any of them were in fact subject to the same rights and obligations under the Rehabilitation Act. Only a handful of the 32 listed were

teachers who regularly worked with disabled students and who therefore might have been subject to the same Rehabilitation Act rights and obligations. In order to establish that these comparable employees were similar for retaliation purposes, Plaintiff must show that they did not complain about the treatment of disabled students, but that they nonetheless were treated more favorably. *See Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). However, Plaintiff has in no way provided the necessary facts to establish this essential element.

In responding to Defendants' motions for summary judgment, Plaintiff summarily states that "[s]imilarly situated special education teachers at Coonley who did not complain of discrimination by Ruyack and Frazin were not removed from their positions at Coonley." Resp. to Board Summ. J. Mot. at 16. However, this assertion is inadequate for two reasons: first, in support of her assertions that these other parties were treated more favorably and were not displaced, Plaintiff cites only to her own affidavit and deposition without providing any evidence of their current employment status or subsequent interactions with Coonley administration; second, though she does not put names to her allegations, there is no evidence that these other special education teachers *did not* complain about the treatment of their students, so even if Blazquez is correct that they were not disciplined it does not necessarily provide her with a parallel situation. *See* May 8, 2003 Letter ("I have witnessed, as other teachers have, a gross abuse of our school system...Several complaints about our leadership have been made by others to the Chicago Teachers' Union.).

In any event, there is no possibility that Frazin could be found liable for retaliation for the simple reason that, even if Blazquez's displacement amounted to an adverse action, there is no

evidence that Frazin had any role in making it happen. It is uncontested that Ruyack was the only Coonley administrator with the formal power to make hiring and firing recommendations to the Board. *See* Clair-McClellan Supp. Decl. ¶¶ 11-13. Plaintiff has suggested that, whatever the official policy might have been, Frazin was nonetheless very involved in the day-to-day decision making at Coonley. *See* Resp. to Facts ¶ 95. However, even if the elements for a Rehabilitation Act retaliation claim were in place, they could not be attributed to Frazin because there is no evidence that he played a role *in this instance.* Though it is uncontested that Frazin and Ruyack discussed Plaintiff's employment, the only additional evidence regarding the decisionmaking process itself suggests that Frazin: (1) made an inquiry to the Board's HR department – at Ruyack's request – asking about available options regarding Blazquez's continued employment; (2) communicated the HR department's response to Ruyack; and (3) gave Plaintiff a copy of the email response from HR in order to communicate to her that she was displaced from Coonley. *Id.* There is therefore no support for Plaintiff's assertion that Frazin played a more active role in deciding whether she should have been rehired. Even if Frazin did play such a role, there is no indication what his contribution to that conversation would have been; as recently as the beginning of her last year at Coonley, the evidence shows that Frazin had planned on recommending Plaintiff for formal appointment. Add'l Facts ¶ 69. Therefore, even if the decision to displace Plaintiff was retaliatory, there is no evidence that Frazin played a role in the decision, or that if he did a play a role that it was in furtherance of that retaliation.

For the reasons stated above, Defendants' motions for summary judgment are GRANTED with respect to retaliation under the Rehabilitation Act (Count II).

## *Section 1983 Claims and the Statute of Limitations*

Defendants have claimed that all claims brought under Section 1983 are time-barred for failing to meet the well-settled two year statute of limitations for such claims in Illinois.  *See Evans v. City of Chicago*, 434 F.3d 916, 934 (7th Cir. 2006).  Civil rights claims accrue when a plaintiff knew or should have known that his or her rights were violated.  *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993).  As this Court stated in its dismissal opinion, and as Defendants now acknowledge, Plaintiff is entitled to relate back to her original state complaint for statute of limitations purposes, so long as the events were sufficiently similar to provide defendant with notice of the action.  *See Donnelly v. Yellow Freight Sys., Inc.*, 874 F.2d 402 (7th Cir. 1989) (applying Fed. R. Civ. P. 15(c) and allowing plaintiff to relate back to state complaint).  As her state complaint was filed June 9, 2005, for her claims to survive Plaintiff must show that she knew or should have come to know that her rights were violated only on or after June 9, 2003.  *See Kelly*, 4 F.3d at 511.

In ruling on Defendants' motions to dismiss, this Court noted Plaintiff's lack of clarity regarding the dates of events.  Nonetheless, outright dismissal was largely inappropriate in light of the need for factual development of events, Plaintiff's pro se status, and the fact that statutes of limitations are generally disfavored grounds for dismissal.  *See* Summ. J. Op. at 12-19.  There is now sufficient clarity in the record to consider whether these claims are time-barred.

*Count III - Section 1983 Due Process Claim:*

Plaintiff's due process claim is based upon adverse employment actions taken against her during the summer and fall of 2003, following the milestone June 9, 2003 date.  Therefore, this claim is not time-barred.

*Count IV - Section 1983 Equal Protection Claim:*

At dismissal there was some confusion as to the basis of Plaintiff's equal protection claim, making ruling on this claim difficult. *See* Summ. J. Op. at 15 ("Plaintiff was still trying to address some of these problems through formal administrative remedies after the school year ended – Plaintiff's complaints and grievances were to some extent being heard by CTU and/or CPS as late as June 3, 2004. Therefore, it is impossible to determine with certainty when she should have been aware of her equal protection claim for the purpose of determining timeliness.") (citations omitted). Plaintiff mischaracterizes this language, claiming that this Court held that because "Ms. Blazquez's complaints and grievances were being heard by the CTU and/or CPS as late as June 3, 2004," she "could not be aware of her rights for the purpose of determining timeliness." Resp. to Ruyack Summ. J. Mot. at 9-10. In point of fact, the issue was simply left open for greater factual development; this Court must now consider whether the claim is in fact time-barred.

Plaintiff makes clear that her equal protection claim is based on the fact that Defendants "granted assault leave to Santiago, the security guard for Ms. Blazquez's classroom, but failed to grant assault leave to Mr. Blazquez for a similar incident with the same child." Resp. to Ruyack Summ. J. Mot. at 9. Plaintiff knew about this discrepancy on or before December 16, 2002, at which point she requested the appropriate leave form in response to being assaulted by student D.R. *See* Add'l Facts ¶ 98. Plaintiff alleges that she suffered additional wrongs related to the refusal to grant assault leave, including cancelled mediation appointments, comments made during mediation, and the fact that leave was only granted after she returned to work. However, all of these events and remedial measures had come to light on or around her return to teaching

on March 24, 2003, by which time she had returned to work and been granted retroactive leave.[15]

To the extent that this resolution settled the matter, Plaintiff suffered no wrong. To the extent that it failed to address her equal protection concerns, she should have known of the wrong that was done to her well before June 9, 2003. Therefore, she has not met the statute of limitations for this section 1983 claim.

For these reasons, Defendants' equal protection claim is time-barred, and Defendants' motions for summary judgment with respect to it are GRANTED (Count IV).

*Count VI - Section 1983 First Amendment Violation*

Plaintiff's First Amendment claim is predicated on the alleged suppression of her right to speak up about failings and abuses, executed by way of her retaliatory displacement from Coonley. That adverse employment action took place during the summer and fall of 2003, following the milestone June 9, 2003 date. Therefore, this claim is not time-barred.

*Count VIII - Section 1983 Hostile Work Environment amounting to Sexual Harassment*

In response to the threat of dismissal on statute of limitations grounds, Plaintiff has alleged several events that occurred after June 9, 2003, and which therefore may allow her claim to survive as a continuing violation. *See* Pl.'s Resp. to Ruyack Summ. J. Mot. at 2-3. Plaintiff now attempts to place dates on these events. *See* Add'l Facts ¶¶ 91, 84. The events listed must therefore be evaluated to determine whether her claim arose between June 9, 2003 and her last

---

[15]There is an additional issue related to Plaintiff's leave, in that on paper she was not listed as having returned to work. Resp. to Add'l Facts ¶ 103. However, notwithstanding Plaintiff's assertion that this was done as a personal attack, it appears that this resulted from Plaintiff's failure to submit a required medical form attesting to her fitness to return. In any event, this issue is tangential to Plaintiff's equal protection claim and cannot be said to have been the basis by which she came to know she was aggrieved. *Id.*

day of interacting with Coonley administration at the school's graduation.

The credibility of testimony is generally a matter to be taken up by a factfinder rather than decided at summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). At the same time, however, a party cannot survive summary judgment simply by contradicting their previous testimony. *Flannery v. Recording Industry Ass'n of America*, 354 F.3d 632, 638 (7th Cir. 2004); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001). Also, to the extent that Plaintiff attempts to introduce new factual allegations into her summary judgment filings, they must be ignored, as by waiting until this time she will have denied Defendants the opportunity to perform discovery on the allegation. *Black v. TIC Investment Corp.*, 900 F.2d 112 (7th Cir. 1990) (citing *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 409-10 (1st Cir.1984)).

In order to survive the statute of limitations defense, Plaintiff asserts the following actions that she allegedly witnessed Ruyack do after June 9, 2003: hugging a student in a sexual way, Add'l Facts ¶ 91b; telling Plaintiff that "she should just get married" and that "men wear the pants," *id.* ¶ 84a-b; discussing his sexual conquests, *id.* ¶ 84(c); and touching the breast of a student's mother, *id.* ¶ 84e.[16] These alleged events are problematic for several reasons. First of all, in several instances Plaintiff simply misrepresents the record: for instance, while her brief

---

[16]Plaintiff additionally claims that Ruyack squeezed the lips and stroked the cheeks of a student, but states only that she admonished Ruyack at graduation, not that the violation itself took place after June 9. Add'l Facts ¶ 91(a). For purposes of determining when her claim properly accrued, and therefore whether she satisfied the statute of limitations, this allegation is irrelevant. Similarly, allegations that Ruyack pressured her to sign a letter regarding student D.R. have nothing to do with a claim for a hostile environment based on gender. *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 692 (7th Cir. 2001) (hostile actions must have "occurred because of the sex of the complainant").

refs to the graduation hug with a student as having been done in "a sexual way," her cited affidavit states only that Ruyack "hugged a female student" at graduation. *Flannery*, 354 F.3d at 638 (finding that an action cannot be saved from summary judgment by contradicting sworn testimony). Second, all but one of these allegations did not involve Plaintiff directly, and accordingly are to be granted less weight as proof of her own hostile environment claim. *Hildebrandt v. Illinois Dept. of Natural Res.*, 347 F.3d 1014, 1035 (7th Cir. 2003).

However, the remaining statements are generally supported by citations to Plaintiff's May 25, 2007 affidavit and do not directly contradict her prior statements. To the extent that Defendants have called into question the credibility of these remaining statements, this is not a proper question at this stage. To the extent that Defendants maintain that these alleged acts are not sufficiently severe as to state a claim for a hostile environment, this is a misinterpretation of the standard of continuing violations – the actions are not to be evaluated as discrete acts, but rather as part of one overarching action that, altogether, amounts to a constitutional violation. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118, 122 S.Ct. 2061, 2075 (2002) ("Given, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.").

Making all inferences in favor of the non-movant, it is sufficient that some actions forming a continuing pattern of abuse at Ruyack's hands took place after June 9, 2003. For this reason, any potential claim for hostile work environment against Ruyack is not time-barred.

Plaintiff also attempts to revive her hostile work environment claim against Frazin that

was previously dismissed. First of all, this Court reiterates that dismissal was appropriate due to the fact that Plaintiff's amended complaint alleges no sexual or gender-based actions on Frazin's part. *See* Am. Compl. ¶¶ 114-17. Second, the additional events that Plaintiff no attributes to Frazin are uncompelling. Plaintiff now points to an allegation that Frazin stroked another teacher's leg. Add'l Facts ¶ 93(b). However, this assertions relies on a blatant misrepresentation of the record, for though Plaintiff now claims that Frazin "stroked [Rojas'] leg and she pushed his hand away," in point of fact the cited page of Plaintiff's deposition says nothing about a leg being stroked or a hand being pushed away, and instead references – twice – the fact that "[h]e took my hand between his and I pulled away." *Flannery*, 354 F.3d at 638. Plaintiff also now points to Frazin's attempt to kiss Plaintiff at a Christmas party in 1999, an event so far removed from the school graduation in 2003 that it cannot be considered part of a pattern of hostility. Other vague allusions to Frazin downloading pornography are similarly unconvincing. The vague, largely second-hand accounts of Frazin's actions do not amount to a pattern of abuse or hostility sufficient to qualify as a continuing violation for statute of limitations purposes. Therefore, even were this Court's prior dismissal inappropriate, Plaintiff's hostile environment claim against Frazin would now be considered time-barred.

### *Due Process Claim*

Plaintiff maintains that Defendants violated her constitutional rights under section 1983 by denying her "[any] procedural due process" in terminating her property interest in protected employment. A finding that due process was denied requires that a constitutionally-protected interest in life, liberty, or property was endangered by the adverse actions taken against her. *Lekas v. Briley*, 405 F.3d 602, 607 (7th Cir. 2005); *see also Bd. of Regents of State Colleges v.*

*Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709 (1972) (finding that, rather than an abstract claim to property, a plaintiff asserting due process rights must "have a legitimate claim of entitlement" to property interests that "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings").

Plaintiff has failed to establish that she had a protected property right in continued employment at Coonley, as required to maintain her due process claim. *Lekas*, 405 F.3d at 607. Under Illinois law, a person has a property interest in his or her job only where they can establish a "legitimate expectation of continued employment." *See Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007). However, the legitimacy of such a claim requires reference to "a specific ordinance, state law, contract or understanding limiting the ability of the state or state entity to discharge him." *Id.* Here, Plaintiff has relied on the terms of her employment as laid out in the Illinois School Code. Resp. to Frazin Summ. J. Mot. at 2-3. Her due process claim fails due to the fact that, by that document's very terms and her own language, she has no legitimate expectation of continued employment.

Plaintiff attempts to establish her vested property rights by asserting that a teacher receives tenure after four consecutive years of teaching, Slavin Dep. at 103-4, as well as school code language that states, in relevant part:

> Appointments and promotions of teachers shall be made for merit only, and after satisfactory service for a probationary period of 3 years with respect to probationary employees employed as full-time teachers in the public school system of the district before January 1, 1998 and 4 years with respect to probationary employees who are first employed as full-time teachers in the public school system of the district on or after January 1, 1998 (during which period the board may dismiss or discharge any such probationary employee upon the recommendation, accompanied

> by the written reasons therefor, of the general superintendent of schools)
> appointments of teachers shall become permanent, subject to removal for
> cause in the manner provided by Section 34-85.

105 Ill. Comp. Stat. Ann. 5/34-84 (Westlaw 2007). Plaintiff takes this language to mean that after four years of employment she is entitled to an automatic grant of tenure, with the vested property rights that go with it. However, it is clear from the record that the requisite four years do not begin accruing until a teacher has been *appointed* as a teacher. Plaintiff at points maintains that she was an appointed teacher, seeking support in the fact that a CPS Teacher Request for Leave of Absence Form indicated that she was "appointed," and was signed and approved by CPS. This single, possibly erroneous, form is unavailing in light of the fact that no other witness has come forward to support Plaintiff's claim that she was an "appointed" teacher, and she has provided no reason to doubt HR specialist Clair-McClellan's declaration that she was a non-tenured FTB substitute teacher throughout her time at Coonley. *See* Facts ¶¶ 135-36. Plaintiff herself admits that any discussion of appointing her – a necessary step prior to being awarded tenure – only took place leading into the 2002-2003 academic year. *See* Resp. to Facts ¶ 133 (conceding that the appointment process is a formalized one, and further answering that "Frazin told Plaintiff that he and Ruyack had decided to appoint her to the tenure track at the beginning of the 2002-2003 school year"). Even if that alleged appointment had been made – which it was not – Blazquez would not have arrived at her four year anniversary for tenure purposes until the 2005-2006 academic year.

Therefore, at the time she was displaced from Coonley, Plaintiff was not yet eligible for tenure, and certainly had not yet achieved it so as to retain a vested interest in continued employment. This Court finds that Plaintiff had no valid constitutionally-protected property

interest in her position at Coonley. As a FTB substitute teacher, she simply did not retain the same benefits and protections as an appointed or tenured teacher. She cannot now erase that distinction based on isolated school code language and a single HR department form in which the issue was not of central importance. Defendants' motion for summary judgment is GRANTED with respect to her due process claim (Count III).

### *Conspiracy*

In Count V, Plaintiff charges Defendants with conspiring to violate her constitutional right to due process and equal protection. Am. Compl. ¶ 87. Plaintiff has outlined these components of the alleged conspiracy: the involved parties were Frazin, Ruyack, and the Board, Am. Compl. ¶¶ 87, 90; and the purpose was to deprive Plaintiff of "due process and equal protection rights" by refusing to give her assault leave and a proper pre-termination process, Am. Compl. ¶¶ 87-88. *See also* Resp. to Frazin Summ. J. Mot. at 6.

In light of the above rulings, there is no remaining basis for a conspiracy under section 1983. The underlying purpose of the conspiracy must involve a colorable claim of a constitutional violation. *See Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982) ("Section 1983 does not, however, punish conspiracy; an actual denial of a civil right is necessary before a cause of action arises."); *Lesser v. Braniff Airways, Inc.*, 518 F.2d 538, 540 (7th Cir. 1975). The direct claim of an equal protection violation based on Defendants' failure to grant assault leave is time-barred. *See* supra, p.34. Therefore, any conspiring that might have taken place to effectuate that denial also took place too long ago to provide a valid cause of action under section 1983 according to the state of Illinois' applicable statute of limitations. *See Evans*, 434 F.3d at 934. As for the alleged conspiracy of attempting to deny Plaintiff her due

process rights through her termination, this Court has determined that Plaintiff has no valid claim due to the fact that she had no property interest in a non-tenure position. *See* supra, p.39. Therefore, there could not have been a conspiracy to violate constitutional rights where the underlying action could not have amounted to a constitutional violation. *See Goldschmidt*, 686 F.2d at 585.

In any event, Defendants are additionally correct that Plaintiff has failed to show that there was any meeting of the minds, a necessary element for her conspiracy claim. As Plaintiff points out, it is true that such a meeting can be inferred from solely circumstantial evidence. *See* Resp. to Frazin Summ. J. Mot. at 7 (citing *Brucar v. Rubin*, 638 F.2d 987 (7th Cir. 1980)). At the same time, the loose standard of proof discussed in *Brucar* referred to the pleading requirement at the dismissal stage, rather than the amount of evidence required of a plaintiff attempting to move past summary judgment. *See Brucar*, 638 F.2d 987. While even at this point circumstantial evidence may be sufficient, Plaintiff must provide some factual evidence of the meeting beyond mere speculation. *See Sparkman v. McFarlin*, 601 F.2d 261, 268 (7th Cir. 1979) (en banc) (rejecting mere allegations unsupported by facts, circumstantial or otherwise).

Here, Plaintiff has provided no direct evidence and scant circumstantial evidence from which a meeting of the minds could be inferred. When considering Defendants' motion to dismiss, this Court stated that Plaintiff must establish that Defendants shared a common intention to deprive her of her constitutional rights. *See* Dismiss Mot. Op. at 20 (citing *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979)). Plaintiff has failed to do so. She has supplied no evidence from which such an intent to deprive could be inferred, relying instead on isolated mistakes and errors from which she has insinuated an underlying motive. In attempting to

establish the existence of a conspiracy to deny her due process rights, Plaintiff points to two times in which Ruyack failed to provide her adequate support, one point at which Frazin failed to do so, and the fact that she mentioned to both that they had "a boss that is bigger than both of you." Resp. to Frazin Summ. J. Mot. at 7. She also points to the fact that Frazin acted as a go-between for Ruyack in his communications with the CPS human rights department, and let Plaintiff know about her displacement by simply handing her a copy of an email. *Id.* at 8. Such isolated failures regarding classroom support or the termination procedures in no way provide circumstantial evidence that constitutional failures surrounding her displacement were part of a larger conspiracy.

For these reasons, Defendants' motions for summary judgment are GRANTED with respect to Plaintiff's conspiracy claims (Count V).

### *First Amendment Violation and Municipal Liability*

The Board of Education is considered a municipal entity and, as such, can only be held liable for section 1983 violations on limited bases. *See Bennett v. Roberts*, 295 F.3d 687 (7th Cir. 2002). Municipal liability under section 1983 cannot be based upon respondeat superior, but instead requires proof that the alleged constitutional deprivation took place as a result of an official policy or widespread custom. *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 402-03, 117 S.Ct. 1382, 1387-88 (1997).

Plaintiff has produced no evidence that any retaliatory employment action taken against her was part of a formal policy or widespread custom of the Board. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (finding that a single incident is insufficient for establishing a municipal policy) ("Considerably more proof than a

single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.") (footnotes omitted).  The Board's alleged liability for First Amendment retaliation is centered on their allowing or facilitating actions taken against school staff for exercising their free speech rights.  Plaintiff has provided no proof that such actions or failures to act were symptomatic of the Board's actions beyond the bounds of what transpired at Coonley.

A plaintiff can show that a municipal policy or custom exists by establishing either:  "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an allegation that the constitutional injury was caused by a person with 'final policymaking authority.' " *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).  Plaintiff has not provided any evidence of either an express policy, or a widespread practice related to the allegedly adverse actions she faced in the instant matter.  Even in her response, Plaintiff references only "the widespread practice of retaliating against Ms. Blazquez" as a sufficient basis for implicating "not only Ruyack and Frazin, but the entire Board."  *See* Resp. to Board Summ. J. Mot. at 6.  This provides no indication of how the Board acts at a wider scale so as to implicate them as a municipality.  *See Tuttle*, 471 U.S. 808.

In order to maintain an argument for the Board's section 1983 liability, Plaintiff must therefore establish that her injury was caused by a person with "final policymaking authority." *McTigue*, 60 F.3d at 382.  However, she makes no colorable argument that any actor involved in her displacement had the authority to make Board policy; Plaintiff's effort to respond to this

issue and save her claim consists of a single paragraph making no mention of whether "final policymaking authority" could be attributed to the Defendants. *See* Resp. to Board Summ. J. Mot. at 6; *see also* Ruyack Summ. J. Mem. at 9-10 (summarizing distinction between decision making and policymaking authority with respect to Frazin and Ruyack). Even viewing the factual situation in terms most forgiving to the Plaintiff, this Court sees no basis for attributing such authority to the parties implicated in this action; there is simply no reason to believe that Ruyack or Frazin as Coonley administrators, or the various CPS administrative employees that Plaintiff interacted with during the complaint process, had the authority to make policy with respect to hiring and firing decisions for the Chicago Board of Education as a whole.

For this reason, Defendants' motion for summary judgment is GRANTED with respect to the First Amendment section 1983 claim (Count VI) against the Chicago Board of Education.

### *First Amendment Violation claim against Frazin and Ruyack*

At the outset, it must be pointed out that for the same reasons discussed above with respect to retaliation under the Rehabilitation Act, *see* supra p. 30, Plaintiff's First Amendment retaliation claim fails against Frazin; there is simply no evidence that he played a role in the decisions allegedly taken against Plaintiff. For that reason, summary judgment must be GRANTED with respect to the First Amendment retaliation claim against Frazin.

Plaintiff claims that she was retaliated against for exercising her First Amendment right to free speech, in that she was displaced from Coonley for speaking up "about a lack of support for and discriminatory treatment of her special education students, an illegal magazine delivery business, harassment by school officials, and attendance and test score alteration." Resp. to Board Summ. J. Mot. at 2. In order to succeed on a First Amendment retaliation claim, a

plaintiff must establish: (1) she was engaged in constitutionally protected speech; (2) the

protected speech was a "motivating factor" in the adverse employment action; and (3) the

defendant cannot prove by a preponderance of the evidence that the same adverse employment

action would have occurred absent the protected speech. *See Spiegla v. Hull*, 481 F.3d 961, 965

(7th Cir. 2007) (hereinafter "Spiegla II")(citing *Mt. Healthy City School Dist. Bd. Of Educ. v.

Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

In light of this Court's ruling that Plaintiff failed to show an adverse employment action

for Rehabilitation Act purposes, *see* discussion *supra* p. 24, it is first necessary to address

whether she has satisfactorily shown an adverse action for this claim under section 1983. *See

Spiegla II*, 481 F.3d at 965. Plaintiff maintains that the retaliation for First Amendment purposes

took the same form as in her Rehabilitation Act claim, i.e., the decision not to rehire her at

Coonley. The standard for what constitutes an adverse action is different for present purposes,

however; an action brought to enforce statutory rights such as those protected by the

Rehabilitation Act must exhibit the materiality or significance of an adverse employment action,

while a claim under section 1983 and the constitutional rights it protects cover a wider range of

deleterious action. *See Power v. Summers*, 226 F.3d 815 (7th Cir. 2000). "Any deprivation

under color of law that is likely to deter the exercise of free speech, whether by an employee or

anyone else, is actionable, even something as trivial as making fun of an employee for bringing a

birthday cake to the office to celebrate another employee's birthday, if...the circumstances are

such as to make such a refusal an effective deterrent to the exercise of a fragile liberty." *Id.*

Plaintiff does mention additional details to emphasize the adversity she faced as a result

of this action, namely, that she: (1) was removed from her job; (2) had to interview for another

position within CPS; and (3) had her medical and dental benefits cancelled. *See* Resp. to Board Summ. J. Mot. at 6. With respect to the first point, Plaintiff again interprets the record contrary to what has already been made clear, i.e., that she was not removed but simply was not rehired. As for the last point regarding medical and dental benefits, Plaintiff has yet to answer the fact that it was her own failure to provide the required doctor's form that resulted in the lapsed benefits. *See* Resp. to Add'l Facts ¶¶ 62, 64, 66-67. Even if this Court accepts that it was not a result of her own error, there is no reason to believe that CPS's failure to complete the relevant paperwork was anything other than a clerical error unrelated to Plaintiff's ongoing dispute with Coonley's administration. *See* Facts ¶¶ 107-108. That said, though the decision not to rehire Plaintiff was entirely discretionary and could have been based on any reason at all, the withholding of that benefit was still sufficient to create an adverse action for section 1983 purposes. *See Power*, 226 F.3d at 821 (allowing for the possibility that denial of a purely discretionary raise could nonetheless amount to an adverse action in section 1983 free speech action).

It is a matter of law, to be considered by the court, whether a plaintiff's comments amounted to protected speech. *See Spiegla II*, 481 F.3d at 965. Whether or not a particular instance of speech should be considered constitutionally-protected is to be determined in light of: (1) whether or not the plaintiff spoke on a matter of public concern; and (2) a balance of "her interest as a citizen in commenting on the matter against the state's interest, as employer, in promoting effective and efficient public service." *Id.* (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Waters v. Churchill*, 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). Matters of private or personal interest, *Gustafson v. Jones*,

290 F.3d 895, 907 (7th Cir. 2002), verbalizations solely related to the duties of one's position, *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1962 (2006), and ordinary matters of internal employment operations unconnected to community concerns, *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690 (1983), are all to be excluded as areas of public concern.

One of the relevant factors in making this determination is whether or not it was Plaintiff's intent to reveal the encountered issues to the public at large. An employee is not to be precluded from accessing First Amendment protections simply because she chose to avail herself of internal processes rather than going straight to external media – the fact that for the most part she "communicate[d] privately with [her] superior[ ] does not make [her] speech less a matter of public concern." *Spiegla v. Hull*, 371 F.3d 928, 937 (7th Cir. 2004) (hereinafter "Spiegla I") (citing *Delgado v. Jones*, 282 F.3d 511, 518 (7th Cir. 2002)). At the same time, the ultimate motivation for that speech must be community-wide in scope, performed not from an interest in personal or internal matters, but rather out of a concern for "bring[ing] wrongdoing to light." *See id.* at 938.

To the extent that Plaintiff maintains that her complaint to the I.G.'s office should form a basis for her various claims of retaliation she is off the mark. The Board has conceded for the sake of summary judgment that her participation in this process included matters of public concern. Board Summ. J. Mem. at 5. However, as this Court has already stated, the filing of the I.G. complaint cannot form the basis for retaliation where there is no evidence that the complaint or subsequent investigation was known to the Coonley administration. *See* supra, p. 29.

Nonetheless, Plaintiff could still establish protected speech so long as her intent to initiate the I.G.'s investigative process, and her related complaints to Coonley administrators,

amounted to matters of public concern sufficient to outweigh the school's interests.[17] The fact of the matter is that Plaintiff repeatedly complained to Frazin and Ruyack about the treatment of her and her students. It is also apparent that her intention – if not her only intention – was in fact to improve the quality of education for the students. Though there is insufficient evidence that the failings at Coonley came out of discriminatory animus, it is nonetheless the case that public waste and the school's failure to meet the needs of its students were at issue in Plaintiff's arguments with Frazin and Ruyack. These are areas of public concern that outweigh any countervailing interest the school might have had in controlling its teachers' views. This Court therefore finds that Plaintiff's written and oral complaints to Coonley administrators, discussions with students' parents, and communications with fellow teachers were protected speech.

In terms of the balance requirement, it is certainly true that Defendants were entitled to exercise some control over the manner in which Plaintiff expressed her displeasure with the administration's operations, particularly within the classroom. *See generally Muller v. Jefferson Lighthouse School*, 98 F.3d 1530 (7th Cir. 1996). However, the Board misapprehends Plaintiff's argument, and its own burden, by applying the balancing test only to Ruyack's discussion of potential lawsuits with students, arguing that their May 7, 2003 letter admonishing her for in-class discussions was entirely appropriate relative to their valid interests.[18] *See* Board Summ. J.

---

[17]Plaintiff references her complaint to the CTU that sought resolution of her request for assault leave. However, that issue was related only to her personal grievances at being denied leave, rather than problems more relevant to the community that were referenced in other communications. *See* Pl.'s Ex. 49. Her complaint to the CTU is therefore irrelevant to her free speech retaliation claim.

[18]Plaintiff maintains that this letter amounted to freezing her discussions with students' parents on this same topic. *See* Resp. to Facts ¶ 98. However, the language of the letter makes no reference to such discussions, and Plaintiff has failed to show that this exercise of administrative control was as excessive as she claims.

-48-

Mem. at 6-7. Defendants' argument does not carry to issues beyond this restriction; insofar as they would argue that Plaintiff should have no right to address her concerns to school administrators, fellow teachers, and/or students' parents, or that deciding not to rehire her for the 2003-2004 school year was an appropriate means of controlling such expressions of her views, they have failed to show how interests would weigh in their favor. Therefore, to the extent that Defendants have not explained how this sequence of events might be warranted by a valid interest in "effective and efficient public service," they fail to defeat the existence of constitutionally-protected speech. *See Spiegla II*, 481 F.3d at 965.

Plaintiff must also prove that her free speech on matters of public concern was a"motivating factor" in the adverse employment action. *Id.* She must therefore prove by a preponderance of the evidence, not that the retaliatory intent was a but-for cause of her displacement, but rather that it was *a* factor that motivated it. *Id.* at 942; *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006). This can be accomplished using only circumstantial evidence. *See id.* (finding that circumstantial evidence is sufficient to establish this prong, rather than direct evidence of a "smoking gun").

Plaintiff has presented sufficient evidence from which a reasonable factfinder could find that Plaintiff's statements and complaints were motivating factors in her discharge from Coonley. Taking all inferences in favor of the non-movant it is clear that, at the very least, Defendants had grown increasingly resistant and unresponsive to Plaintiff's complaints, indicating that they were generally displeased with her for bringing the issues to their attention. Though the May 7, 2003 letter from Ruyack limiting Plaintiff's in-class speech was arguably within the bounds of his authority, this writing allows for the inference that there were wider

tensions between Plaintiff and the administration regarding what she was saying about the school. Indeed, Ruyack's May 5, 2003 letter to the CPS Labor Relations Department indicates that he was bothered not only by the in-class statements the Board now claims were properly squelched, but also by Plaintiff's communication with students' parents regarding Coonley affairs. Add'l Facts ¶ 11.

Also, the timing of events provides additional circumstantial evidence of causality. The decision not to rehire took place during the summer immediately after the most intense series of exchanges between Plaintiff and school administrators, providing some evidence that they were causally connected. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) ("It is settled in this Circuit that, 'a plaintiff may establish...a causal link between protected expression and adverse action through evidence that the [action] took place on the heels of protected activity.").

Because Plaintiff has established all other required factors, the burden shifts to Defendants, who can avoid First Amendment retaliation liability by proving by a preponderance of the evidence that the same employment action would have occurred absent the protected speech. *See Spiegla II*, 481 F.3d at 965. In support of this, the Board points out that Defendants in any event would have displaced Plaintiff for: "(1) allowing an adult male to enter Coonley, without permission, and address her students in a threatening manner; (2) informing her 7th and 8th grade students, during class time, and on more than one occasion, that she planned on suing some of them, as well as her principal and assistant principal; (3) violating the Student Records Act by mentioning one of her students negatively and by name, in the report card of another student; and (4) permitting her children to exit a school bus directly onto the street, as a City bus

was approaching." Board Summ. J. Mem. at 5 (citing Facts ¶¶ 97-98). The Board also mentions Plaintiff's poor teaching performance as part of its reason not to rehire Plaintiff, presumably relying on Dr. Lorys's affidavit describing her criticisms of how Blazquez dealt with her students. *See id.* at 6; Facts ¶ 87; *see also* Lorys Supp. Decl. ¶ 1 ("Among other things, her teaching methods were didactic and her students appeared bored.").

First of all, it should be noted that several indicators seem to show that Plaintiff was satisfactorily completing the duties of her position: she was well-rated by Coonley administration in all reviews prior to her final year; she received two Chicago Foundation for Education grants, one each in 2000 and 2002; and Frazin told her at the start of the 2002-2003 school year, less than a year before her displacement, that he was going to recommend her for formal appointment. Countervailing evidence is generally unconvincing.

Defendants' were entitled to rely on the critique of an experienced advisor such as Dr. Lorys in evaluating teaching staff. However, it might strike a reasonable factfinder as unusual that the relatively benign nature of Lorys' criticisms – that Blazquez's teaching was "didactic" and her students were "bored" – would be fatal to her continued employment, particularly in light of the inherent difficulty of her teaching situation and the years of unproblematic service she had already put in at Coonley. Similarly, in light of Plaintiff's explanations the remaining concerns about her teaching might seem insufficient to warrant an adverse employment action: Ruyack claims that an unauthorized adult male was invited into 308 and threatened the children, though Plaintiff responds that the threat never occurred, the visitor was authorized, and that Ruyack only heard about the event third-hand; Plaintiff's excessive discussion of lawsuits with students and parents may have been inappropriate, but there is no indication that she failed to

respond to the administration's May 7, 2003 request to refrain from such comments, and indeed, she wasn't given a chance to improve between receiving the letter and being displaced; Plaintiff concedes that she mentioned a student in another student's report card in a manner that arguably violated the Student Records Act, but explains that this was done in order to communicate to the parents concerning their in-class relationship and improve their learning experience; and, finally, Plaintiff effectively contradicts Defendants' portrayal of the bus incident, claiming that she attempted to deal with the situation as best she could, and that Ruyack in any event misrepresented the facts by claiming a city bus was involved that apparently doesn't exist. *See* Resp. to Facts ¶ 97. In light of these factors, Defendants have failed to establish as a matter of law that the same employment action would have occurred absent the protected speech.

It is also necessary for this Court to consider Defendants' claim that they are protected from section 1983 liability because of qualified immunity. Application of this protection is determined by a two-part test, requiring that the court ask: (1) [t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [employer's] conduct violated a constitutional right?": and (2) if there was a violation, was the right "clearly established"? *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001). This Court has already shown that there is sufficient evidence for finding that Ruyack's conduct violated a constitutional right. Her speech was clearly protected in light of the importance of the involved matters – public waste, special education, discrimination in the workplace – and Defendants have been unable to explain how its valid interests counterbalance that fact. *See generally Pickering v. Bd. of Ed. of Tp. High School Dist. 205, Will County*, 391 U.S. 563, 574, 88 S.Ct. 1731, 1737 (1968) Defendants may have retaliated against Plaintiff due to their personal animosity toward her and

their own unwillingness to deal with the problems she addressed.  This is in violation of clear

and longstanding law.  *See id.,* 391 U.S. at 574 ("[S]tatements by public officials on matters of

public concern must be accorded First Amendment protection despite the fact that the statements

are directed at their nominal superiors.").  This Court therefore finds that a constitutional right

was potentially violated and that the legal principles at issue were sufficiently clear at the time

for Defendants to understand the violation.

All of the elements of Plaintiff's First Amendment retaliation claim are therefore

satisfied, and Defendants' motion for summary judgment is DENIED with respect to Plaintiff's

First Amendment retaliation claim (Count VI).

### *False Claims Act*

Plaintiff also claims that Defendants violated the anti-retaliatory provision of 31 U.S.C. §

3730 ("False Claims Act") by ending her employment at Coonley following her complaints of

administration wrongdoing.  In order to establish a violation of section 3730(h), the Plaintiff

must establish that: "(1) the acting official has the authority to take, recommend, or approve any

personnel action; (2) the aggrieved employee made a disclosure protected under section

2302(b)(8) [Whistleblower Protection Act]; (3) the acting official used his authority to take, or

refuse to take, a personnel action against the aggrieved employee; (4) the acting official took, or

failed to take, the personnel action against the aggrieved employee because of the protected

disclosure."  *Lachance v. White*, 174 F.3d 1378, 1380 (Fed. Cir. 1999) (citation and internal

quotation marks omitted).

At the outset, the FCA claim against Frazin must be set aside as Plaintiff has been unable

to produce evidence establishing his role in retaliating against her.  *See* supra, p. 30.  There is no

evidence that Frazin was in a position to recommend or effectuate hiring and firing decisions, much less proof that he actually did so in this instance as a result of her alleged whistleblowing. Blazquez's only support for her allegation that Frazin had any authority or involvement regarding the taking, recommending, or approving of a personal action is her own unsupported, subjective belief that that he in fact did so. Plaintiff points to the fact that Frazin discussed whether or not Blazquez would be invited back for the 2003-2004 academic year, contacted HR to determine the available options, and communicated to Blazquez that she had lost her job. *See* Pl.'s Resp. to Frazin Summ. J. Mot. at 12-13. None of these facts establish that Frazin was involved in the decision making process, or in particular that he contributed to the retaliatory animus that is at the heart of Plaintiff's claim. For that reason, summary judgment is GRANTED with respect to the FCA claim against Frazin.

Similarly, while the Board had the ultimate authority to effectuate employment determinations, in this instance there is no evidence that they played a role in the decision making process that led to Plaintiff's displacement. *See* Add'l Facts ¶ 48 (discussing email from CPS's HR department giving Ruyack license to determine Plaintiff's employment status). Lacking any such evidence of the Board's involvement, and above and beyond that lacking any indication of what might have been motivating the Board's hypothetical involvement, Plaintiff has no basis for surviving summary judgment on her claim against the Board. Summary judgment is GRANTED with respect to the FCA claim against the Board.

Plaintiff has claimed that she was retaliated against after reporting certain problems at Coonley, including: (1) the running of a magazine business out of the school by Frazin and Ruyack; (2) adjustments made to test scores by parties in the administrative office; and (3) the

altering of attendance records, allegedly with the intent of impacting state funding.[19] *See* Pl.'s Resp. to Frazin Summ. J. Mot. at 11. Plaintiff essentially maintains that her reports to higher CPS authority on these issues, combined with her assistance to the I.G.'s subsequent investigation, caused Ruyack to terminate her employment in retaliation. *Id.*

As stated previously, there is no evidence that Ruyack was in any way aware of the I.G. complaint and investigation., *see* supra p. 29, and it therefore cannot form the basis of Plaintiff's claim of retaliation. Also, the I.G. complaint was the only communication in which Plaintiff expressed her concerns over test and attendance record alterations. As there was no prior communication of these allegations to anyone, including Ruyack, they are entirely unavailable as bases for the alleged retaliation under FCA. With respect to other isolated references to the business or clerical discrepancies, Plaintiff has failed to provide evidence of fraud-related complaints that were known to Ruyack. *See, e.g.*, Add'l Facts ¶¶ 1, 14-15, 19, 21. What remains, then, of Plaintiff's WPA-protected complaints against which Ruyack might have retaliated is the following: her remark "you both have a boss that is bigger than both of you," Add'l Facts ¶ 13; and a reference in her May 8, 2003 letter to "inappropriate computer use," *id.* ¶ 16.

There is little argument that Defendant Ruyack has "the authority to take, recommend, or approve any personnel action." Even if he was not able to act on his decisions unilaterally, he certainly had the power to recommend the action. The first element of this FCA claim is satisfied with respect to Plaintiff's FCA claim against Ruyack.

---

[19]Plaintiff reiterates claims and allegations regarding alleged sexual harassment at Coonley. However, these issues have nothing to do with issues of fraud and will therefore be disregarded with respect to the FCA claim.

Under the second element of a FCA claim, this Court must also consider whether Plaintiff's actions were protected under the Whistleblower Protection Act ("WPA"). The provision in relevant part states that:

> Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority...take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of...any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences...a violation of any law, rule, or regulation, or...gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, if such disclosure is not specifically prohibited by law...

5 U.S.C. § 2302(b)(8)(A). A plaintiff need not have actual knowledge of FCA in order to qualify for its protections, and the statutory language is to be interpreted broadly in light of its purpose. *See Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004). In light of these considerations, the question of whether an action qualifies as protected under the FCA's adoption of the WPA language falls to whether: "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Id*.

It appears likely that Plaintiff's rather vague remarks and complaints came from a reasonable suspicion of fraudulent activity that had arisen by the summer of 2003. As of the spring of that year, Plaintiff had complained to the I.G., and in that complaint she included wide-ranging accusations against Coonley administrators. However, what is fatal to the FCA claim is the fact that Plaintiff has provided no evidence of Ruyack's knowledge of her intent to initiate that investigation when he made the decision not to rehire her. The only two relevant comments that were known to him cannot carry the weight of establishing a causal connection between

fraud allegations and his employment decision: the threat of speaking to "a boss bigger than both of you" could have related to any of a multitude of claims regarding racial discrimination, gender discrimination, or failure to properly discipline students; also, when read in context the "inappropriate computer use" Plaintiff mentions is dismissively compared to "unfair and immature" claims leveled against her. *See* May 8, 2003 Letter ("If you are to believe the statements made about the issues at hand, without at least providing me with a conference and my legal representation, as I asked you in my letter to you dated April 30th, then am I to believe the statements made about the administration and other? [sic] It appears there is someone who would like to throw fire to the wind, and it is truly unfair and immature.").

These isolated and vague references do not amount to a colorable claim or investigation into fraud against the government warranting protection under the first element of a FCA claim. More damning, however, is the fact that they did not place Ruyack on notice that Plaintiff was intending on attacking his allegedly wasteful or fraudulent activities in such a way that he might have found it necessary to retaliate against her for it. There is therefore insufficient evidence from which a causal connection could be drawn between Plaintiff's whistleblowing and Ruyack's decision not to rehire her. *See Lachance*, 174 F.3d at 1380. Therefore, a necessary element of Plaintiff's FCA claim fails. Summary judgment is therefore GRANTED with respect to Plaintiff's FCA claim against Ruyack (Count VII).

### ***Hostile Work Environment***

Sexual harassment, as a general matter, is an actionable constitutional violation under Section 1983. *Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1185 (1986); *see also Collins v. Vill. of Woodbridge*, 96 F.Supp.2d 744, 751 (N.D. Ill. 2000) (finding that it has been established

in the Seventh Circuit since at least 1986 that sexual harassment in the workplace violates the Equal Protection Clause). In order to succeed on her claim that she suffered sexual harassment in the form of a hostile work environment, Plaintiff must establish that she was subjected to harassment so severe or pervasive that it altered the conditions of her employment in a manner that was both subjectively and objectively hostile. *McKenzie v. Milwaukee County*, 381 F.3d 619, 624 (7th Cir. 2004) (Title VII claim). Factors to be considered in this evaluation include: (1) whether the discriminatory conduct was frequent or severe; (2) whether the conduct was physically threatening or humiliating; and (3) whether the conduct unreasonably interfered with her work performance. *Id.* It should also be noted that second-hand harassment is not to be given the same weight as that which the plaintiff herself experiences, and harassment unconnected to the plaintiff's status, e.g., not gender-based, is not be given any weight at all. *Id.* at 624-25.

"[R]elatively isolated instances of nonsevere misconduct will not support a claim of a hostile environment." *Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir.1998) (citing *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir.1993). Also, behavior that is merely rude is insufficient for sustaining a hostile environment claim. "Not every unpleasant workplace is a hostile environment. The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is the one that is hellish." *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F .3d 428 (7th Cir.1994)).

Defendant is correct in asserting that several of the factors allegedly contributing to the hostile environment have nothing to do with either sexual concerns or gender issues. *See, e.g.*,

Resp. to Ruyack Summ. J. Mot. at 6 (referencing racially discriminatory actions). While such acts may portray Ruyack as hostile or obnoxious, this does not change the fact that these actions provide no evidence that the environment made Plaintiff uncomfortable *as a woman.* Similarly, Defendant is correct that Plaintiff cannot fold her discrete claim of discrimination based on failure to provide her with leave into her more general claim of a hostile work environment. *See Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S.Ct. 2162 (2007).

In light of these constraints, Plaintiff's claim of a gender-based hostile work environment against Ruyack is based upon a relatively limited universe of actions. *See* summary *supra* p. 5. These include:"pulling Plaintiff up" to dance at a school event in 2001 or 2002; touching the face of a student several times; touching a mother's blouse on the breast; and failing to discipline several boys who verbally and physically abused a female student in 308. In addition, Blazquez claims to have witnessed or been subject to the following remarks made by Ruyack: telling Plaintiff that "men wear the pants...why don't you just get married?"; recounting past sexual "triumphs"; referring to female teachers as "bitches"; discussing how easy it is to be intimate with drunk women; and referencing the size of women's breasts or butt. In light of this limited list of factors that might validly lend themselves to the creation of a hostile environment based on gender, this Court must now consider the factors dictated by *McKenzie*. 381 F.3d 619, 624.

With respect to the frequency and severity of Ruyack's inappropriate behavior, neither compels this Court to deny summary judgment. *See McKenzie*, 381 F.3d at 624. The Seventh Circuit has repeatedly upheld grants of summary judgment based upon factual situations significantly more severe than the instant case. *See, e.g., Valentine v. City of Chicago*, 452 F.3d 670, 682 (7th Cir. 2006) (overturning grant of summary judgment where plaintiff had suffered

nearly daily comments and been touched inappropriately half-a-dozen times, discussing the fact that all acts were focused on plaintiff); *Russell v. Bd. of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336 (7th Cir. 2001) (upholding summary judgment despite references to plaintiff as "grandma," statement that all intelligent women are unattractive, a comment about the "staff from hell," calling each of plaintiff's female colleagues a bitch at least once, along with references to a co-worker as dressing "sleazy" and "like a whore," and that she had been hired for her looks).

The alleged severity of the hostile environment at Coonley is also undermined by the fact that the vast majority of the incidents cited by Plaintiff as proof of a hostile work environment did not happen to her directly and/or were not witnessed by her. *See* Add'l Facts ¶¶ 80-87, 91-93. While this does not mean these allegations are not worthy of consideration with respect to evaluating Plaintiff's hostile environment claim, they are to be afforded less weight. "When harassing statements are directed at someone other than the plaintiff, the impact of such second hand harassment is obviously not as great as the impact of harassment directed at the plaintiff." *Russell*, 243 F.3d at 343 (citing *McPhaul v. Bd. of Comm'rs*, 226 F.3d 558, 567 (7th Cir. 2000)). In addition, the frequency of the actions in this instance are not so extreme as to create material issues of fact either; Plaintiff alludes to a long history of Ruyack's inappropriate sexual jokes and comments about his sexual exploits, but when pushed to elaborate can only offer two comments. This does not indicate the sort of constant harassment that has proven a hostile environment before other courts.

In evaluating Plaintiff's hostile environment claim this Court must also consider whether the conduct was physically threatening or humiliating. Plaintiff concedes that she was able to do

her work, and largely attributes any interference with classroom functions to a "lack of discipline support in her classroom." Resp. to Facts ¶¶ 29, 31. There is no evidence that Plaintiff ever felt physically threatened by Ruyack's behavior. Even the extent to which his behavior was humiliating to Plaintiff is contradicted by several factors. At certain points, Plaintiff's response to Ruyack's offensive behavior was notably tepid, in that she characterized his actions as mere tomfoolery. *See, e.g.*, Facts ¶ 27 (referring to some of his commentary as "acting like a clown" and "stupid"). She also did not generally find it necessary to remove herself from Ruyack's presence. At the Christmas party at which Ruyack danced with Plaintiff, she did in fact dance with him, did not physically resist, and stayed at the Christmas party afterward. Plaintiff does say that afterward she was uninterested in attending future Coonley social events, but still the level of threat or humiliation was not sufficiently high to interrupt her evening. Similarly, at every turn Plaintiff made it clear that her first choice was to maintain employment at Coonley, which does not support a claim that her work environment there was sufficiently "hellish" to warrant constitutional protections.

Finally, this Court must consider whether the actions attributed to Ruyack unreasonably interfered with Plaintiff's work performance. *McKenzie*, 381 F.3d at 624. It is clear that Plaintiff garnered good performance reviews throughout her time at Coonley – or at least up until her final academic year there – so it does not appear that her work performance was noticeably impacted. While she repeatedly points to her frustration dealing with the students of room 308, these problems are in almost every instance attributed to the lack of resources and assistance she was provided. *See* Add'l Facts ¶ 96 (stating that "[t]he sexual remarks, advances and the way the students were treated in a sexual manner by Ruyack and Frazin created

increased anxiety for Ms. Blazquez, and while it did not prevent her from doing her job, it did interfere with her job," but then elaborating on the more severe consequences of Defendants' denial of assault leave).  In fact, in all of her complaints to Coonley administrators concerning frustration with her work, she makes no mention of how the allegedly sexually-charged or discriminatory environment was contributing to these problems.  Even when she contacted the I.G.'s office, while she incorporated a claim of "sexual harassment and gender harassment" with her other complaints, neither she nor the I.G. appears to have pursued this any further, despite the fact that his office was expressly charged with investigating such claims.  *See* Add'l Facts ¶¶ 3-10.  From all indications, therefore, Plaintiff's attempts to ease her teaching burden and improve her work situation were significantly more focused on having the Coonley administration provide more logistical support to the classrooms, rather than decreasing the gender-based content of their interactions with staff.

Therefore, this Court finds that Plaintiff's portrayal of her work environment amounts to "relatively isolated instances of nonsevere misconduct." *Ngeunjuntr*, 146 F.3d at 467.  While the situation she describes under Ruyack's supervision was certainly unpleasant, obnoxious, offensive, and/or rude, there is insufficient evidence to say that it was objectively hostile or abusive as is required.  *See Rogers*, 320 F.3d at 752.

For that reason, summary judgment is GRANTED with respect to Plaintiff's hostile environment claim (Count VIII).

**Conclusion**

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED in part and DENIED in part, as described above.  In summary, the First Amendment retaliation claim (Count VI) remains against Defendant Ruyack only, and summary judgment is GRANTED with respect to all other claims.

Enter:


/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **August 20, 2007**